IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DANIEL ESPINOZA ZENTENO,** | **Case No. 1:14-cv-00394 AWI MJS (HC)** |
| Petitioner, | **FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |
| **v.** | |
| **CONNIE GIPSON, WARDEN,** | |
| Respondent. | |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent is represented by A. Kay Lauterbach of the office of the Attorney General.

I.    **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kings, following his conviction by jury trial on March 24, 2011, for kidnapping, rape, and various enhancements. (Clerk's Tr. at 320-21.)  Petitioner was sentenced to an indeterminate sentence of fifty-eight (58) years in state prison.  (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District, on April 4, 2012. (Lodged Doc. 32.) The court affirmed the judgment on July 17, 2013.  (Lodged Doc. 35, People v. Zenteno, 2013 Cal. App. Unpub. LEXIS 4996 (July 17, 2013).) Petitioner requested rehearing, and the court granted rehearing based on the recent Supreme Court case Alleyne v. United States, 133 S. Ct. 2151 (2013). Upon rehearing, the court again affirmed the judgment on October 9, 2013. (Lodged Docs. 36-40.) On January 21, 2014, the California Supreme Court denied review. (Lodged Docs. 43-44.) Petitioner did not seek collateral review of the petition in state court.

Petitioner filed the instant federal habeas petition on February 25, 2014.  (Pet., ECF No. 1.) Petitioner presents four claims for relief in the instant petition.  Petitioner alleges: (1) that his Sixth Amendment right to confrontation was violated by the presentation of testimony by a law enforcement officer of confessionary statements of a non-testifying defendant; (2) that his right to counsel of his choosing was violated by the trial court denying his motion to discharge retained counsel; (3) that counsel's conduct was ineffective based on a conflict of interest based on counsel's failure to present useful evidence to Petitioner's defense; and (4) that his right to a trial by jury was violated by the trial court's determination as to a```whether there were separate occasions of sexual assault. (Id. at 20-41.)  Respondent filed an answer to the petition on June 20, 2014. (ECF No. 20.) Petitioner did not file a traverse. The matter stands ready for adjudication.

## II.   STATEMENT OF THE FACTS[1]

### PROCEDURAL SUMMARY

On February 18, 2011, the Kings County District Attorney charged defendant and his two codefendants, Rolando Jaramillo and Victor Cordova Alatorre, with the kidnapping and rape of victim on April 1, 2009. Count 1 charged all three defendants with kidnapping to commit rape or rape in concert (§ 209, subd. (b)(1)). Count 2, a lesser crime, charged all three defendants with kidnapping by force or fear (§ 207, subd. (a)). Count

---

[1]The Fifth District Court of Appeal's summary of the facts in its October 9, 2013 opinion is presumed correct.  28 U.S.C. § 2254(e)(1).

2

3 charged all three defendants with rape in concert (§ 264.1). Count 4, a lesser crime, charged defendant with rape (§ 261, subd. (a)(2)). Count 5 charged defendant with sexual penetration (§ 289, subd. (a)(1)). With respect to all counts, the information alleged defendant personally inflicted great bodily injury on victim (§ 12022.7, subd. (a)). With respect to counts 4 and 5, the information alleged that defendant inflicted great bodily injury on victim in the commission of a sex offense (§ 12022.8). With respect to counts 3, 4, and 5, the information alleged special circumstances under section 667.61, subdivisions (a), (b), (d), and (e).

A jury found defendant guilty on counts 1, 3, and 5, and found true all of the special allegations and circumstances.[fn3] The trial court sentenced defendant to 58 years to life, as follows: on count 5, 25 years to life for sexual penetration with special circumstances, plus a five-year term on the great bodily injury enhancement under section 12022.8, plus a stayed three-year term on the great bodily injury enhancement under section 12022.7; on count 3, 25 years to life for rape in concert with special circumstances, to be served consecutively to the sentence in count 5, plus a three-year term for the great bodily injury enhancement under section 12022.7; on count 1, a stayed term of life.

**FN3**: Codefendant Rolando Jaramillo was tried before the same jury and found him guilty on counts 1 and 3.

Codefendant Victor Alatorre entered into a plea agreement and testified at trial.

## FACTS

In December 2008, 29-year-old victim worked as a cashier at a gas station in Lemoore. She met defendant because he was a repeat customer. Eventually they exchanged names, although defendant gave her a false name. The first time defendant asked her for her cell phone number, she told him, "[W]hat if you're married[?]" The second time he asked, she gave him her number. He told her he was 36 years old, about 10 years younger than he actually was. And he told her he was childless, divorced, and had been single for 10 years, rather than married with five children. They started dating. They went dancing and out to eat. In January 2009, he took her to a motel, but she did not feel comfortable and they did not go inside. Later that month, they went to a different motel. Defendant told her they would watch television. Instead he took off his clothes and started kissing her. She allowed him to undress her and perform oral sex on her. He rubbed her vaginal area with his penis, but did not penetrate her with it. He did not have an erection. She was a virgin and defendant told her, "[I]t's hard to penetrate a virgin so don't you ever say somebody raped you." She did not understand why he would say that.

They went to a different motel later that month to be together. They were both naked and they kissed, but victim did not want to have sex, so they massaged each other. She believed defendant was upset because she refused to have sex.

Victim considered defendant her boyfriend and she wanted to marry him. He had asked her to marry him and she had agreed, although they had no formal engagement. Defendant came to victim's house to talk to her mother. In victim's presence, he told her mother that he wanted to

3

marry victim. At some point, victim visited a health care provider to evaluate birth control methods, and she decided they should use condoms, although they never did.

On February 7, 2009, one day after victim's birthday, they went back to the first motel. They kissed and defendant rubbed his penis around her vagina, but he did not have an erection. Defendant attempted to penetrate her with his penis. He told her he could not do it because she was making him uncomfortable, like he was raping her. He was able to penetrate her slightly for just a few seconds. This was the first time. She went to the bathroom and noticed she was bleeding.

On February 8, 2009, defendant took victim to his brother's house to meet him. As they left his house, victim was confronted by a woman who asked her if she knew defendant was married. The woman said she was defendant's wife. She told victim, "[H]ave a lot of patience towards [defendant]."

Victim was upset because defendant had lied to her. She remained quiet until they were driving to her home. She asked him why he had lied to her. He said he was only 14 years old when he got married, was no longer living with his wife, and wanted to divorce her. Defendant took victim home. Victim was disappointed in defendant and wanted to end the relationship, so she told him she did not want to see him anymore.

Defendant attempted to communicate with victim. He called, sent text messages, and went to her workplace.[fn4]

**FN4**: When victim was asked on cross-examination if she told defendant that he would have to steal her (counsel used the Spanish word "robarme") and tie her up if he wanted to see her, she said, "No, I don't recall saying that to him."

On Wednesday, April 1, 2009, victim worked until about 10:00 p.m., then drove home to Stratford. She parked her car in front of her home and everything seemed normal. She got out and started walking toward the entrance. She noticed a stranger, Victor Alatorre, hiding behind her sister's car, crouching by the car's tire. She asked him, "[W]hat are you doing?" He stood up and grabbed her face, putting his palm over her mouth. Her glasses fell off. He told someone to grab her feet. Victim was fighting and she managed to move Victor's hand. She yelled for help. Another man, Rolando Jaramillo, grabbed her feet. Victor put his other hand around her stomach and they carried her to a car that pulled up. She continued to struggle and yell for help. She fought and bit, but she was unable to free herself and the two men managed to put her into the back seat of the car. Victor pushed her in one side and the other man pulled her legs in from the other side. The two men got into the back seat with her. Once inside, she realized it was defendant's car. Defendant was in the driver's seat and he started driving. As victim continued to struggle, Rolando tied her hands together with a shoelace or string while Victor held her. As they did, victim bit Victor's finger. Rolando told her to stop struggling or they were going to hurt her. Defendant pulled over and told the men to tie her up. Rolando tied victim's feet together with another string. Defendant told the men to make sure "they cover [her] mouth good." One of the two men covered her mouth with duct tape. They put tape around her hands too. Defendant drove a while, then stopped. Rolando got out of the car and went to

4

another car. Defendant started driving again. After several minutes, he pulled over again and met with someone who drove a small truck with a camper shell. Victim managed to pull the tape from her mouth and she asked Victor why he was doing this. She asked him if he would want someone to do this to his mother or sister. She was crying and she asked him to let her go. He told her this was a favor he owed defendant because defendant had saved his life. He said he could not let her go because the person defendant was meeting with had a gun and would kill him. She did not know who that person was. Defendant returned and started driving again. Victim was crying and defendant turned the radio up. At some point, he asked Victor if victim was okay. Eventually, they reached the same motel that she and defendant had visited before. Defendant stopped and Rolando approached from another car. Defendant got out. Rolando and Victor pulled victim out of the back seat and carried her into a motel room that defendant opened. The room looked like the same one they had been in before. Rolando and Victor put her on the carpeted floor between the bed and the dresser, and they left. Victim was still tied up, although her mouth was no longer taped.

Defendant sat down on the floor by victim. He said he did not want to do that but it was the only way he could be with her and talk to her because she did not want to be with him. Then he stood up and started taking his clothes off. He put a pillow under her head. He pushed up her shirt and bra under her chin and started kissing her breasts. She was wearing black pants and a sweater tied around her waist. After kissing her breasts all over, he pulled her pants and underwear down below her knees. He moved his head toward her crotch, but she was able to cross her legs, even though she was still tied up. She repeatedly told him no. He forced his knee between her legs to open them, and he put his finger into her vagina, which he had never done during their relationship, and she felt pain. She testified: "Because I could feel, like, if he hurt me. I don't know if it was, like, with his nail, but when he introduced the finger, it—there was—I felt pain." He returned to kissing her breasts. He managed to open her legs more and he penetrated her vagina with his penis, pushing himself inside her. This time he had an erection. It was painful and awful for victim; it hurt a lot. She continued to tell him no and she told him he was hurting her. She tried to push him away with her hands. He said nothing. Her feet were still tied, but she could not remember if her hands were. He remained inside her for minutes. When he withdrew, there was white liquid on her legs and she saw that she was bleeding from her vagina.

Defendant came to her side and told her he was sorry. She stayed a few minutes on the floor. She was no longer tied, but she did not know how she had become untied. Defendant brought her some toilet paper so she could clean herself up. She got up, dressed herself, and went into the restroom. She cleaned herself of blood with toilet paper. When she came back, he told her there was blood on the pillow. He took the case off and washed it in the restroom. He came to her and hugged her. She did not hug him back. He said he was sorry and he would take her to her house. She remembered wearing a beaded necklace that night, but she no longer had it and did not know what happened to it.

She got into the car with defendant. She was crying. She was disappointed and could not believe he had done that to her. When they got to her house, she looked for her things that she remembered dropping

when the men grabbed her. Defendant helped her look. She found her glasses, pen, and car keys. She wrote the license plate number of defendant's car on her hand, in case she needed to report it to the police. She went inside the house and closed the door. Her mother, sisters, and niece were all asleep. She wrote down the license plate number on a piece of paper. She took her clothes off and put them in a plastic grocery bag for the police. There was blood on her underwear and on the sweater that had been tied around her waist. She believed defendant had raped her and she wondered what she should do. She was scared and confused. She was afraid defendant could hurt her family. She went to bed, but could not sleep.

In the morning, she did not tell her family what had happened. Defendant sent her a text message and she responded. She could not remember the content of either message. She went to work that day. Defendant came and told her he was sorry and, now that he looked at her, he realized what he had done was wrong.

The next time she saw him was three days later, on Sunday, April 5, 2009. She had the day off. Defendant came to her house and they talked about what had happened on April 1, 2009. She asked him about the two men and he said they were not his friends. He insisted that he was sorry and that he wanted to talk with her mother. Defendant told the mother that victim might be pregnant, but she no longer wanted to marry him because he had lied about not being married. He told her mother to convince victim to marry him, so she could forgive him and get married. Victim told him, "[J]ust tell her the truth," meaning that she could be pregnant because he raped her. But he did not mention the events of April 1, 2009. Victim's mother went back inside. Defendant told victim his divorce was in the process and they could get married. He said a lawyer was helping him. Defendant left and victim went back inside the house.

Victim told her mother she did not willingly have sex with defendant. She explained what had happened. Her mother told her to call the police, but she was hesitant because she was embarrassed, scared of defendant, and afraid she might be deported.

The next morning, April 6, 2009, victim went to the station and spoke to Detective Waggle. After that, she was examined by Patricia Driscoll, a Sexual Assault Response Team (SART) nurse.

Victim's Examination

Driscoll was highly trained and had performed about 1,500 SART exams during the prior 10 years. Victim told Driscoll she had been abducted from her yard by two men who tied her arms and legs together and taped her mouth. She was taken to a motel, left on the floor tied up, and assaulted by her ex-boyfriend when he kissed her breasts and penetrated her with his finger and penis. Victim told Driscoll she had never had sex before this assault. Driscoll observed bruising on victim's arm. When Driscoll examined victim's external genitalia, she did not observe any injuries. She inserted a clear speculum to examine the vagina. She noticed bleeding from lacerations or tears to the upper part of the vagina. Victim reacted in pain, so Driscoll took the speculum out immediately. She tried using a smaller speculum, but that caused pain as well. The pain was too severe for her to examine victim further or take internal photographs.

6

Driscoll removed the speculum. She had never been unable to take photographs due to severe pain. She inserted a Foley catheter and inflated the balloon to put pressure on the wounds and stop the bleeding. At this point, she observed that a portion of victim's hymen was missing altogether. Victim's injuries were consistent with the use of force. Her profuse bleeding and severe pain prompted Driscoll to advise her to go to the emergency department immediately for treatment.

Driscoll told Detective Waggle that victim's injuries were the worst she had ever seen and victim needed to go to the emergency room to be treated, so Detective Waggle took victim to the hospital where she was examined by Lorri Bolt.[fn5] Detective Moroles went to victim's home to get the clothing she had worn on April 1, 2009, including the blood-stained underwear, pants, and sweater.

**FN5**: <u>See</u> Bolt's testimony, post.

<u>Defendant's Apprehension</u>

Later that day, detectives arranged a recorded pretext call between victim and defendant. Victim asked defendant about the men who kidnapped her and put her in his car. He said they were just men from Arizona that his friend, Armando, told him about. Defendant gave the two men a few hundred dollars. He had to hire them because he had a bad back. He said he took her to the motel to be alone with her and he felt bad and guilty for what he had done. He felt desperate and wanted to talk to her and be alone with her. It had been a while since he had been with a woman. He felt very sad because he never intended to hurt her. Defendant said, "I know I am guilty of all of this." He said he did not feel good about any of it and he was ashamed. He knew he hurt her, and he never thought he would do the damage that he did. She asked him, "[W]hat if I'm pregnant[?]" He said, "[F]or me, it would be a beautiful thing. I would take care of you." She said, "[Y]ou didn't take care of me before." He said, "I know." He said he wanted to see her. At times during the conversation, defendant became suspicious as victim asked him questions. He would ask, "[W]hat are you doing? Where are you[?]" He said, "[A]re you with the police? Don't do that to me." He said, "I know you are asking me these questions to lock me up. Go ahead and lock me up then." At this point, she asked him, "[W]hy did you have sex with me in the manner you did?" He answered, "[O]h, my God, you permitted me to. I never would have done that unless you permitted me to." She said, "[I]f I permitted you to, it wouldn't have hurt." He said it hurt because it was her first time. He would not tell her his location, but he was desperate to see her, so they agreed to meet that evening at Taco Bell.

Officers waited at Taco Bell and arrested defendant without incident. At the station, Detective Waggle conducted a recorded interview with the assistance of a certified Spanish language interpreter.

<u>Defendant's Interview</u>

In the interview, which was played for the jury, defendant told Detective Waggle that he hired two strangers to help him take victim because he was desperate to see her. He did not plan to have sex with her at the motel, and the two men did not know he was going to have sex with her. He did not have her permission to take her, and he thought he

had done something wrong because he was led by a passion to do these things. He explained to Detective Waggle that the two men grabbed her in her front yard and she fought back because she was scared. The two men put her in the back seat of defendant's car and got in with her. Defendant told victim to calm down because he just wanted to talk to her. Then she got more upset, asking him why he was doing this to her. He said he needed to talk to her. She said this was not the gentlemanly thing to do. She said she did not think he could ever do something like this to her. She said he did not love her. He told her he did not want to do this, and he did love her, but he needed to do it because she refused to talk to him and he was losing everything for her. He and the two men tied her hands and feet with a nylon rope so she would not escape. He told her he was sorry he was hurting her but he had to tie her up because she would try to jump out of the car and get hurt. He also used tape on her hands because the rope did not tie well. She told him he had no reason to do this. He said he understood but he needed to know what was going on with them. He told her he expected her to be upset, but she had to understand that he was desperate. She was screaming loudly, saying he was not a man. He told her to be quiet because she would wake the neighbors; if she did not stop, he would have to cover her mouth. He put a piece of tape over her mouth. She later took the tape off and remained quiet. He told her he was taking her to the motel and they would just talk. If she wanted, they could get married the next day.

At the motel, he went in the office and got a room while victim and one man stayed in the back seat. The men carried victim into the motel room. Defendant and victim lay down and talked. She was crying and she looked at him and asked why he had to do this. She asked why he would do this if he loved her. She said she could not believe he was this kind of person. He had claimed to be such a great man and look what he had turned into. He asked her to forgive him; he had made a mistake because he was desperate. He said he wanted to know what was going to happen to him because he had lost everything and she refused to talk to him. After about 20 minutes, her stress dissipated and they just talked. By this time, she had untied herself. He told her he felt bad about this and he wanted her to forgive him. He said she could take the keys to his car and leave. When she did not leave, he grabbed some pillows from the bed. She stayed quiet. He told her to hug him. She hugged him and they hugged for 20 minutes. He kissed her and she kissed him. He asked her if she wanted to be with him. She remained silent and just looked at him. He started caressing her. He took her clothes off and then took his own clothes off. As he continued caressing her, he kissed her neck and breasts. He put his fingers inside her vagina to see if she was ready for him to penetrate her. He decided she was ready and they had sex. She was not afraid. It did not last very long because she was bleeding a lot. She was a virgin. She started to bleed when he penetrated her with his penis. He was afraid because he had blood on his hands, and he said he was hurting her. She turned to look at him and he asked what he should do. She stayed still and positioned herself. He took this, plus her hug and kiss, to mean that he could penetrate her. He continued until he finished. He ejaculated inside her because they both wanted a baby. She did not tell him to stop. He did not rape her. If he had raped her, she could have scratched or kicked him. Afterward, they hugged and stayed on the floor. Then he got up and got towels and started cleaning the blood. He offered her some water and they talked for a while. He offered to take her to his house or to her house and she told him to take her to her house. They left

the motel around 4:00 a.m. Outside her house, they talked about getting married. He said he did not want to ruin her reputation. She said she did not think they were going to make it because she felt very bad about going around with a person who was not yet divorced.

Defendant told Detective Waggle that on Sunday, April 5, 2009, he went over to victim's house. He and victim talked to victim's mother. Defendant told her that victim might be expecting a baby and he wanted to apologize to her because he had lied to her about being single when he asked for victim's hand in marriage. He assured her that he had started the process of divorce that day, but he did not know if victim had started to feel differently and no longer wanted to marry him. The mother said victim was a grown woman who knew what she wanted to do. The mother left, and defendant and victim continued talking until 2:00 a.m. Victim told him she was confused, and if a baby was born, she did not know what was going to happen. He was not the person she thought he was, and she was proving herself a bad mother by being there with him. He told her she should not blame herself because she did not want to be with him; he had taken her.

Defendant told Detective Waggle that he felt bad at every moment and there were so many people to whom he needed to apologize. Detective Waggle allowed defendant to write apology notes. He wrote to his wife and to victim.

Defendant explained to Detective Waggle that before April 1, 2009, he and victim had sex about five times, but he had never been able to penetrate her because she would bleed and he would feel bad and not want to hurt her. As soon as he tried to penetrate her, she would bleed. One day, she mentioned that they had not been able to do it and she laughed. He said he did not want to hurt her.

Defendant told Detective Waggle that what happened on April 1, 2009, was not like the Mexican custom of stealing a girl and having sex with her so she would be forced to stay with him. He explained that he did take victim but he did not force her or rape her. She wanted to be with him too. In fact, just the night before the interview, she had given him the beaded necklace he was wearing. She was happy with the baby she could be carrying.[fn6]

**FN6**: Victim did not remember giving the necklace to defendant. The last time she saw it was the night she was raped.

Surveillance Footage

At trial, the jury was shown surveillance video footage from outside the Kings Rest Motel on April 1, 2009. At 10:54 p.m., defendant's car pulled into the parking lot. He got out of the car and walked into the office to obtain a room key. He showed his Mexican identification card. The clerk wrote down information and handed the keys to defendant. A white pickup pulled in and parked. Defendant got in his car and parked it in front of the room. Rolando and Victor carried victim into the room, then walked back outside. Victor got into the driver's seat of defendant's car and moved it into a parking stall. As Rolando and Victor walked away, Victor looked at his left arm, which was where victim said she bit him.[fn7] At about 11:03 p.m., the white truck left the motel parking lot. At 3:05 a.m. the next

morning, footage showed defendant driving his car out of the motel parking lot.

**FN7**: Later, Victor identified himself on the surveillance video and showed Detective Waggle where victim bit his arm and finger.

Rolando's Interview

Rolando did not testify at trial, but Deputy Lemus testified regarding the April 26, 2009 interview of Rolando. Deputy Lemus, who was fluent in Spanish, assisted Detective Waggle in the interview. Rolando provided several untruthful versions of his story, but Deputy Lemus told him there had been a kidnapping in Stratford and he believed Rolando had been involved somehow. Rolando eventually explained that Victor called him around 7:00 p.m. and asked if he wanted to make a quick $100. Rolando agreed. He drove a white pickup truck to the Kmart across the street to meet Victor and his friend, defendant.[fn8] Victor told Rolando they were going to kidnap defendant's girlfriend and they wanted Rolando's help. They advised Rolando of the plan to kidnap the girlfriend. They were going to take two vehicles to Stratford. Rolando agreed to be involved only as far as driving or moving vehicles, but not to be involved in the actual crime.

**FN8**: Rolando told Lemus he did not know Victor's friend, so Lemus arranged a photographic lineup. Rolando identified defendant.

The three men drove two vehicles to Stratford. Defendant drove his vehicle, and Rolando drove the white pickup with Victor as a passenger. Rolando parked the pickup down the street from victim's house. Rolando and Victor got into defendant's car and they drove to victim's house. Victor and Rolando got out and positioned themselves in the dark near victim's house and waited for her to come home from work. The plan was for Victor to grab her and Rolando would open the car door so Victor could put her inside, but when Victor grabbed victim, she immediately began to fight back, screaming and kicking. Rolando believed people would hear and catch them in the act, so he grabbed victim's feet and helped Victor drag her to the car. Rolando got in the car first and pulled her in as Victor pushed her in. She was kicking and screaming, so Rolando took a piece of string or rope that was in the car and bound her feet together. She continued to fight and he grabbed her hands and tied them. He suggested that she be gagged. Victor took the bandana from his pocket and tried to shove it into her mouth. That did not work, so Rolando suggested putting tape over her mouth. After her mouth was taped, she was subdued and secured. At this point, they drove to the white pickup and Rolando got out of defendant's car and into the truck and followed defendant's car. He helped carry victim to the motel room.

Lemus asked Rolando about the cultural practice in Mexico of taking a girl and keeping her so her parents would approve of their marriage. Rolando understood that a girl could be raped in this situation. The girl's parents would force her to marry the man if she had had sex with him.

Victor's Testimony

Victor agreed to testify truthfully in exchange for an eight-year sentence, rather than a potential life sentence. Victor had known Rolando

for eight or ten years, including when they were in Mexico. On March 31, 2009, Victor and Rolando were talking outside Victor's trailer in a trailer park in Lemoore when they saw defendant drive up in a truck. Victor had never seen or met defendant before. Defendant asked them if they wanted some work, and they said yes. Defendant took Victor's number and said he would call later and tell him what they would be doing.

At about 9:00 p.m. the next day, defendant called Victor and asked if he could meet him at Kmart and he agreed. Victor called Rolando and told him to meet in front of Kmart.[fn9]

FN9: Victor had a 2007 misdemeanor burglary conviction for shoplifting at that Kmart.

At Kmart, Victor got into defendant's car and Rolando followed them to Stratford in the white pickup. Rolando parked the truck and got in the car. They stopped to buy soda and cigarettes, then parked the car in front of a school for 10 or 15 minutes. There, defendant told them the plan. He said his girlfriend would be arriving in her car and they would take her. He was going to marry her but she was mad at him and did not want to see him again. They needed to grab her so he could talk to her and clear things up. If her mother found out they were together, she might agree that they should get married. Defendant told them that if victim did not want to go, they should grab her and put her in the car forcibly, although he told them not to use violence. Defendant said he would pay the two men $150 to split now and then more later. He did not tell them they would take victim to a motel and Victor did not expect that to happen. The two men agreed to do the job. At victim's house, the two men got out and hid in the yard. Victim arrived in her car and then walked toward the house. Victor grabbed her upper body and Rolando ran up and grabbed her feet. Defendant pulled the car up and opened the car door. Victim yelled for help and fought to free herself by kicking, slapping, and biting. She appeared frightened. She bit Victor on his finger and arm. With difficulty, the two men managed to get her in the car. All three of them got in the backseat. Defendant started driving and he passed Rolando some shoestring to tie her feet so she would not try to yell or move. She was kicking and slapping. Defendant stopped the car in the middle of the road and turned around to help hold her hands. He and Rolando tied her hands. Rolando then tied her feet. She was not tied up tightly. She was yelling so defendant tried to put a bandana in her mouth, but she resisted. Defendant told her, "[H]ey, it's okay, it's me." When she recognized defendant, she calmed down a little and quit resisting, but she said he was not a man because he needed help to grab her and take her. She said a lot of things and defendant asked her not to speak. He grabbed some duct tape and put it over her mouth and also put some around her hands. She was sad and crying, and she seemed somewhat frightened. Defendant drove to the white pickup and told Rolando to get out.

Alone with victim in the back seat, Victor removed the tape from her mouth and she remained quiet. She asked Victor why he had done this. He did not answer. She asked whether he had sisters and would like that to happen to them. He said no.

At the motel, Victor and Rolando carried victim into the motel room. Victor took defendant's keys and moved his car. Victor returned to the room and gave defendant his keys at the door. Defendant handed Victor

11

$150, and Victor returned to the white truck where Rolando was waiting. They split the money and drove back to the trailer park in Lemoore.

The next day, defendant called Victor. Victor and Rolando went to defendant's house where he gave them a piece of furniture and another $100 to split. Victor did not see defendant again.

Victor had heard of the Mexican practice of a man taking a young girl by force to his home; the girl's parents think they have been together sexually and they make them get married.

Defense Evidence

Lorri Bolt

Lorri Bolt, a family nurse practitioner in the emergency department of the hospital, examined victim following Driscoll's advisement. Bolt held a higher position than Driscoll in the nursing ranks; however, Bolt was not trained in the forensic examination of sexual assault victims. The court accepted Bolt as an expert in general nursing examination of wounds.

On April 6, 2009, Bolt examined victim to evaluate and repair lacerations that were observed by Driscoll. Upon examination of victim, Bolt did not observe any external injuries. She inserted a lighted speculum and observed no active bleeding and no internal injuries—no lacerations, no tears, and no interruption of the vaginal lining. Bolt saw no evidence of the lacerations that concerned Driscoll.

Bolt did see a small amount of old blood, which was evidence of healing. She could not say that no injuries existed because the vaginal area heals rather quickly. When shown photographs of victim's bleeding, Bolt agreed it was not normal and could have been caused by lacerations.

Gonzalo Pimentel

Gonzalo Pimentel lived in Stratford. He knew defendant from playing soccer. He saw defendant and a girl at the A & M Market. Defendant introduced the girl as his girlfriend and said they were on the way to a dance. Gonzalo could not remember when this occurred. It may have been in March or April of 2009.

Defendant

Defendant testified on his own behalf. He explained that he met victim at the store where she worked around November 20, 2008. He had no interest in her because she was a younger woman, but she insisted so much that he finally agreed to go out with her. When she asked him his name, he told her his four last names. She misunderstood his last name, assuming it was something different, and he told her she was correct. He told her he was 36 years old, even though he was 45. He also told her he was single, although he was married. He did not have any reason to give her any further explanation because they did not know each other and he did not have to tell her anything. They exchanged phone numbers and they called each other and went out often. Around December 20, 2008, defendant asked her to be his girlfriend and she agreed. She was "super happy"; she had been waiting for that. From that moment, they began

having sexual relations. In January, she told him she was pregnant. They made arrangements with her mother to get married. They were in love and they talked about having a family. She always wanted to get pregnant but she had "a very big problem" because she would bleed a lot when they had sex. He never understood the reason. They would have sex in the car and at motels. They would have intercourse and he put his finger inside her vagina to prepare her for intercourse. It was part of his caressing of her. When they had sex, it was always to completion. He would always ejaculate inside of her because their intention was to have a family. She could have been a virgin because she always bled profusely and she experienced pain. She might have had a problem, but he was not a doctor.

In about January 2009, defendant's wife, an "excellent woman," discovered he was dating victim. That month, defendant told victim he was married. Victim became jealous of the wife. Victim told him this, but he sent her flowers and they were fine again. His wife confronted them around February 8, 2009, but they continued seeing each other and having sexual relations until about April 5, 2009.

The big problem he and victim had was that she would always tell him she was pregnant, but she refused to show him any proof. That was why they fought. It bothered her that defendant was married and she would constantly tell him so, but he would say some sweet words to her and she would be fine.

On two or three occasions (once in front of a friend) after the confrontation with defendant's wife, victim told defendant to steal her. She told him if he wanted to continue seeing her, he would have to show her his love. She said, "[S]teal me. Tie me up, drag me, whatever you need ... that's the only way I'm going to understand that you love me." Defendant would never have thought of this. In fact, he told her that he was too old to do such a ridiculous thing. She told him he was not too old to get her pregnant and she wanted him to demonstrate that he wanted to be with her. He said he could not do it. Two or three days later, she told him to do it. He said he would do it, but his arm was injured and he could not do it alone.

Defendant knew Victor from his childhood. On about March 31, 2009, defendant saw Victor at a gas station and asked him to help give victim a surprise. He told him that victim was his girlfriend and she asked him to do this. He said, "I just want to give her this surprise and take advantage of the fact the 1st of April is rolling around."

Around 10:00 p.m. on April 1, 2009, Victor arrived with another man who was a stranger to defendant. When they met near victim's house, the two men got into defendant's car. He then parked in front of victim's house so she could see his car. The two men got out and waited near the house. They were supposed to help get victim into the car and not harm her because she was going to be his wife. Even though he had asked him to tie her up tightly, they did not do it "because it was just a surprise that [they] were going to give her." As defendant saw victim arriving, he made a U-turn and pulled in front of her driveway so she could see his car. As she was closing up her car, he was picking out some CD's for her and he did not know "what happened because [his] car ha[d] tinted windows and it was dark so [he] didn't know what happened." When the two men brought

victim to the car, she seemed scared because she did not know Victor and defendant had not told her who was coming because it was a surprise. She was struggling until defendant told her, "[I]t's me," and then all her struggling ended. He told her he was just doing what she had asked him to do. Victor tied shoestrings around her hands and feet and used tape only "to tape the ends together." Victim had asked that she be tied up tightly, but defendant thought it was unnecessary and foolish. Victor also put a piece of tape on her mouth, but she was able to take it off. During the 20-minute drive, they did not speak much. He asked her if she was okay and she said she was fine.

Defendant testified that he did not kidnap victim; he just did what she had asked him to do. He took her to the Kings Rest Motel, where they had been several times. The last time they were there was February 7, 2009, when they celebrated her birthday. When they arrived on April 1, 2009, he stopped at the motel office, paid for a room, and got the key. He used his identification with a false name because he just grabbed that one, which he used for getting work. The two men took victim to the room. She was already free of her bindings, or she freed herself while she was on the floor. The two men left and defendant lay down next to her on the floor. Defendant offered her his keys because she told him she was going to work that day. He also offered her his cell phone to call her mother and let her know she was with him. They were supposed to go to Las Vegas to get married, but he told her they need not go if she wanted to work instead. She wanted to stay with him and she declined his keys. He got a cramp, so she took off his shirt and gave him a massage. Then they started caressing each other. Their clothes were completely removed. She put her sweater underneath her because the carpet was dirty. He caressed her, including her vaginal area. As always, he put his finger in her vagina to prepare her for sex so it would not hurt her so much. She put a pillow under her buttocks, he got on top of her, and they "had [their] sexual relations, like [they] always [did]." She did not tell him to stop, nor did she try to push him off, scratch him, or bite him. He ejaculated inside of her, and then noticed she was bleeding. He got up to get some toilet paper so they could clean themselves. He took the pillow case off because it was bloody, and he washed it in the bathroom, leaving her alone in the room for about 30 minutes. She got dressed and did not try to leave. They sat on the bed and watched television for about 30 minutes as they were talking about the future. They left the motel about 4:30 a.m. because victim had to go to work. She looked at her cell phone to keep track of the time. They went to the car, and he returned the key to the office while victim remained in the car. They talked on the drive back to victim's house. Victim's demeanor was normal. At her house, they both got out and looked for the items she had dropped when the men took her. Defendant gathered them all up and gave them to her. He walked her to the door and they hugged and kissed good-bye, as usual, because she had to go to work.

The next day, defendant went to victim's workplace and they held hands. He also sent her some text messages that day to see how she was doing. When he referred to himself as an animal, it was because he believed he had hurt her during sex. He reminded her to forgive him for not having told her that he was married, which was a continual topic between them. He asked her why she gave herself to him because he knew "if [he] spoke to her in that way, she would be happy so [he] always looked for a way to do that."

14

On April 5, 2009, defendant went to victim's house. He and victim talked outside from 6:00 p.m. to 3:00 a.m. about a lot of things, such as her pregnancy and going to Las Vegas to get married. He asked her to call her mother out. Defendant told her mother that victim might be pregnant. Her mother got very upset because she thought victim was a virgin. She told them to fix their own problems and she went inside. Victim gave him a necklace as a gift. It was the necklace he was wearing when Detective Waggle interviewed him.

Detective Waggle tricked him into writing the apology letters. Detective Waggle said he was going to give those to defendant's wife and victim. Defendant apologized to his wife because he had committed adultery, and he apologized to victim because he had told her he was not married.

On cross-examination, defendant explained that he and victim had sex a lot more than five times. It was not true that he could not get an erection on February 7, 2009. He had never been unable to do those things.

Victim knew defendant was going to surprise her by taking her, but she did not know when. He waited until April 1, 2009 "to give her the surprise that she wanted." Defendant did not pay the men to help him. He just gave them something in appreciation for the favor they did him. They tied victim up because she wanted defendant to demonstrate that he could do what she wanted him to do. Both he and victim intended to get married that night, but she had her keys from work and she had to go to work to open the store.

When the prosecutor asked defendant if he told Detective Waggle that victim was crying when she was placed in the motel room, defendant said, "If you recall, I was very sick during that interview. [¶] ... [¶] Well, a lot of things, I was just saying them to say them because I just wanted to go back to my house. Like I said before, I was feeling very sick."[fn10]

**FN10**: In the video of the interview, defendant coughed a few times and mentioned that his penicillin was at home.

In the recorded pretext phone call, defendant mentioned the first time because victim always thought of herself as a virgin and he was trying to make her feel like one. She liked being called a virgin and feeling like a virgin, even though she was always saying she was pregnant. They were going to get married in Las Vegas, even though he was already married, because "over there they will marry you, no questions asked."

He had not done anything illegal. Victim asked defendant to take her and he did. She asked him to get some trustworthy people to help him and he did. During the pretext call, he said he was guilty because "that was something shameful and [he] didn't feel good from the beginning." But he did it because she asked him to. He mentioned jail because "the thought just occurred to [him] that way." When he said he knew he had hurt her and had done damage, he meant the damage from her illusions of their getting married and having a family when he was not yet divorced.

The day after victim's "surprise," he sent her a text message: "[L]ast

15

night I realized what kind of animal I have become. I feel pity for myself. There is no forgiveness for me from you or God but I did it all for love. I love you, [victim]." Defendant explained that he referred to himself as an animal because he was lying to victim about his wife, even though victim had known that since January 2009. When the prosecutor asked him why, just a few hours after the "surprise" he gave victim and their parting on good terms, he would think about being an animal and lying to victim about being married, defendant said, "Well, that's something that we would normally do, we would talk about that." He continued: "As I mentioned, that's what I always had the custom of doing because I wanted to remind her of that problem that we had had, that me being married, that's all." The prosecutor asked, "Even after a wonderful night together?" Defendant answered, "As I said, that was just a custom and habit that I had to ask her those things and say hello to her." He explained that he said he felt pity for himself "because lying to somebody telling them that you are single when you are married is a very ugly terrible thing so that's why I sent her the text message." She wrote back: "I'm supper [sic], thanks to you. I don't want to hear from you again in my life." This did not surprise him "because [he] would ask her questions and she would respond however she wanted." That was their custom. That was the way they [*40] did it. He responded to her text: "[D]on't separate our lives and forgive me.... I swear to you that what happened last night hurts me so much." When he said this, he simply wanted to make her feel okay. That was how they always spoke to each other. Other people could not understand, but that was how they communicated. She wrote back: "[Y]ou already destroyed my life, now stay away from me forever. This is the last time I will tell you and respond to your messages." Defendant explained that victim meant "simply that [he] had lied to her about [his] wife ... because that was the constant discussion between [them]." That was the only thing they argued about. She was mad that he was married. The prosecutor asked, "Well, didn't you expect her to be very happy because you had accomplished the surprise that she had requested just the previous evening?" Defendant answered, "Well, in reality, you could see that's how it was."

At trial, defendant identified a petition for dissolution of his marriage that was dated March 18, 2009.

<u>Rebuttal Evidence</u>

Victim's mother met defendant in January 2009 when he was in the yard talking to victim. Defendant introduced himself to the mother and told her he was victim's boyfriend. He said he had been raised an orphan and, thanks to God, he had done very well. He was a truck driver and, although he was out of work, he would start working again. He was tired of being alone and was thinking of having a serious relationship with victim. They were going to get to know each other and if they understood each other, they were going to get married. He asked the mother's permission to have a dating relationship with victim. She said yes, provided victim agreed.

The only other time the mother saw defendant was on April 5, 2009. At 8:00 or 9:00 p.m., she realized victim was in the front yard talking to defendant. Victim signaled for the mother to come outside. Defendant asked her to help him convince victim to go back to him because she was very angry with him. He said maybe victim was pregnant. The mother told him it did not matter to her if victim was pregnant and she would not force

her to go back to him. The mother was not upset that victim might be pregnant out of wedlock. Victim told defendant, "[T]ell her why, tell her," but defendant was silent. The mother went back inside the house. Victim stayed outside with defendant another four or five minutes, then came inside.

Surrebuttal Evidence

On June 27, 2010, Investigator Lisa Sobalvarro contacted victim's mother at her home. Sobalvarro asked the mother if she knew defendant. The mother said defendant came to her house on April 5, 2009. She said she went outside to speak to him and victim after they called her on her cell phone and asked her to come out. Sobalvarro asked if defendant and victim had kissed or hugged, but the mother would not go into any detail about their contact.

Sobalvarro also asked the mother the last time she thought defendant and victim had seen each other. She said victim had decided not to see defendant anymore on March 21, 2009. Since then, victim had kept to herself and her demeanor was very sad and solemn.

People v. Zenteno, 2013 Cal. App. Unpub. LEXIS 7286, 2-42 (Oct. 9, 2013).

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  (Pet.)  In addition, the conviction challenged arises out of the Kings County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a).  Accordingly, this Court has jurisdiction over the instant action.

### B.    Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by AEDPA provisions.

Under AEDPA, a person in custody under a judgment of a state court may only be

1   granted a writ of habeas corpus for violations of the Constitution or laws of the United

2   States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus

3   relief is available for any claim decided on the merits in state court proceedings if the

4   state court's adjudication of the claim:

5       (1)  resulted  in  a  decision  that  was  contrary  to,  or  involved  an
6       unreasonable  application  of,  clearly  established  federal  law,  as
        determined by the Supreme Court of the United States; or

7       (2)  resulted  in  a  decision  that  was  based  on  an  unreasonable
8       determination of the facts in light of the evidence presented in the State
        court proceeding.

9   28 U.S.C. § 2254(d).

10              1.      Contrary to or an Unreasonable Application of Federal Law

11      A  state  court  decision  is  "contrary  to"  federal  law  if  it  "applies  a  rule  that

12   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

13   that  [are]  materially  indistinguishable  from  [a  Supreme  Court  case]  but  reaches  a

14   different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at

15   405-06).  "AEDPA does not require state and federal courts to wait for some nearly

16   identical factual pattern before a legal rule must be applied . . . The statute recognizes . .

17   . that even a general standard may be applied in an unreasonable manner." Panetti v.

18   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

19   "clearly established Federal law" requirement "does not demand more than a 'principle'

20   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

21   decision to be an unreasonable application of clearly established federal law under §

22   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

23   (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-

24   71 (2003).  A state court decision will involve an "unreasonable application of" federal

25   law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at

26   409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).  In Harrington v. Richter, the

27   Court further stresses that "an *unreasonable* application of federal law is different from

28   an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011) (citing Williams, 529

1    U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks
2    merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the
3    correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541
4    U.S. 653, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts
5    have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.
6    Ct. 1855, 1864 (2010).  "It is not an unreasonable application of clearly established
7    Federal law for a state court to decline to apply a specific legal rule that has not been
8    squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419
9    (2009) (quoted by Richter, 131 S. Ct. at 786).

### 2.    Review of State Decisions

11       "Where there has been one reasoned state judgment rejecting a federal claim,
12   later unexplained orders upholding that judgment or rejecting the claim rest on the same
13   grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the
14   "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198
15   (9th Cir. 2006).   Determining whether a state court's decision resulted from an
16   unreasonable legal or factual conclusion, "does not require that there be an opinion from
17   the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85.
18   "Where a state court's decision is unaccompanied by an explanation, the habeas
19   petitioner's burden still must be met by showing there was no reasonable basis for the
20   state court to deny relief."  Id.  "This Court now holds and reconfirms that § 2254(d) does
21   not require a state court to give reasons before its decision can be deemed to have been
22   'adjudicated on the merits.'"  Id.

23       Richter instructs that whether the state court decision is reasoned and explained,
24   or merely a summary denial, the approach to evaluating unreasonableness under §
25   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments
26   or theories supported or, as here, could have supported, the state court's decision; then
27   it must ask whether it is possible fairminded jurists could disagree that those arguments
28   or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

1   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

2   was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).   AEDPA "preserves

3   authority to issue the writ in cases where there is *no possibility* fairminded jurists could

4   disagree that the state court's decision conflicts with this Court's precedents."   Id.

5   (emphasis added).   To put it yet another way:

6
   As a condition for obtaining habeas corpus relief from a federal
    court, a state prisoner must show that the state court's ruling on the claim
7   being presented in federal court was so lacking in justification that there
    was an error well understood and comprehended in existing law beyond
8   any possibility for fairminded disagreement.

9   Id. at 786-87.   The Court then explains the rationale for this rule, i.e., "that state courts

10  are the principal forum for asserting constitutional challenges to state convictions."   Id. at

11  787.   It follows from this consideration that § 2254(d) "complements the exhaustion

12  requirement and the doctrine of procedural bar to ensure that state proceedings are the

13  central process, not just a preliminary step for later federal habeas proceedings."   Id.

14  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

15              3.      Prejudicial Impact of Constitutional Error

16          The prejudicial impact of any constitutional error is assessed by asking whether

17  the error had "a substantial and injurious effect or influence in determining the jury's

18  verdict."   Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

19  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

20  state court recognized the error and reviewed it for harmlessness).   Some constitutional

21  errors, however, do not require that the petitioner demonstrate prejudice.   See Arizona v.

22  Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

23  (1984).

24  **IV.   REVIEW OF PETITION**

25          **A.      Claim One: Violation of Confrontation Clause**

26          Petitioner, in his first claim for relief, asserts that his Sixth Amendment right to

27  confrontation was violated by the presentation of testimony by Deputy Lemus of his

28  interview with co-defendant Rolando. Rolando did not testify, and his statements

1   implicated Petitioner in the kidnapping and rape.

2               1.    State Court Decision

3        The claim was denied in a reasoned decision by the Court of Appeal (Lodged

4   Doc. 40.) and in a subsequent petition for review filed with California Supreme Court

5   (Lodged Doc. 44.) "[W]here there has been one reasoned state judgment rejecting a

6   federal claim, later unexplained orders upholding that judgment or rejecting the claim

7   rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is

8   referred to as the "look through" presumption.  Id. at 804.  Since the Court of Appeal was

9   the last court to issue a reasoned opinion on this issue, this Court "looks through" the

10  California Supreme Court decision to the reasoned analysis of the Court of Appeal. In

11  the last reasoned decision denying Petitioner's claim, the appellate court explained:

12       I.    Aranda-Bruton Error

13           Defendant contends the Aranda-Bruton error that occurred at trial
14       was not harmless as the trial court found. Defendant argues that his
         version of the events diverged sharply from victim's and was supported by
15       ample evidence. He maintains that in this "close case with conflicting
         versions of events, ... the prejudicial error contributed to the verdicts
16       obtained." We disagree.

17       A.    Facts

18           At trial, as Deputy Lemus began testifying about his interview of
         Rolando, he said Rolando eventually explained that Victor called him and
19       asked if he wanted to make a quick $100. Rolando said he did, so he
         drove a white pickup truck to the Kmart to meet Victor and defendant.
20       Victor told Rolando they were going to kidnap defendant's girlfriend and
         they wanted Rolando's help. They told him about the plan to kidnap the
21       girlfriend. They were going to take two vehicles to Stratford. Rolando
         agreed to be involved only in driving vehicles, but not in the actual crime.
22       When they drove to Stratford, defendant drove his car, and Rolando drove
         the pickup with Victor as a passenger. Rolando parked the pickup a
23       distance from victim's house. He and Victor then got into defendant's car
         and went to victim's house. Victor and Rolando got out and waited in the
24       dark for victim while defendant waited in the car. Rolando was supposed
         to only open the car door for Victor, but when Victor grabbed victim, she
25       fought back, screaming and kicking. Rolando thought they would get
         caught, so he grabbed victim's feet and helped Victor get her to the car
26       and force her inside. Once she was inside defendant's car, they drove to
         Rolando's pickup. Rolando got out of defendant's car and into the pickup.
27       He followed defendant's car to the motel.

28           When the prosecutor asked Deputy Lemus if Rolando told him what
         happened when the three men were in the car with victim, the court called

21

1
2
3

for a sidebar. The trial court and the parties agreed an <u>Aranda</u>-<u>Bruton</u> violation had occurred. Defense counsel asked for a mistrial, but the prosecutor argued the error was harmless in light of the other evidence. After considering the matter, the court concluded the error was harmless because Rolando's statements were cumulative of properly admitted evidence.

4

B.   <u>Analysis</u>

5
6
7
8
9
10
11
12
13

"The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' The right of confrontation includes the right of cross-examination." (<u>People v. Fletcher</u> (1996) 13 Cal.4th 451, 455 (<u>Fletcher</u>).) In a joint trial, a confrontation problem can arise if one defendant makes an out-of-court statement that incriminates both that defendant and a jointly charged codefendant. (Ibid.) "Generally, the [out-of-court statement] will be admissible in evidence against the defendant who made it (the declarant)." (<u>Ibid.</u>, citing Evid. Code, § 1220 [hearsay exception for party admissions].) However, if the declarant does not submit to cross-examination by the codefendant (the nondeclarant), "admission of the [out-of-court statement] against the nondeclarant is generally barred both by the hearsay rule (Evid. Code, § 1200) and by the confrontation clause (U.S. Const., 6th Amend.)." (<u>Fletcher</u>, supra, at p. 455.)

14
15
16
17
18
19
20
21

In <u>Bruton</u>, supra, 391 U.S. 123, "[t]he United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a [codefendant] when determining the latter's guilt, admission of such a confession at a joint trial generally violates the confrontation rights of the nondeclarant." (<u>Fletcher</u>, supra, 13 Cal.4th at p. 455; <u>Bruton</u>, supra, at pp. 126, 135-137.) In <u>Aranda</u>, supra, 63 Cal.2d 518, the California Supreme Court reached a similar conclusion on nonconstitutional grounds. (<u>Fletcher</u>, supra, at p. 455; <u>Aranda</u>, supra, at pp. 528-530.) Thus, <u>Aranda</u>-<u>Bruton</u> bars admission, at a joint trial, of a nontestifying defendant's out-of-court statement that incriminates a codefendant, even if the court instructs the jury to consider the statement in determining the guilt only of the declarant, because admission of the statement violates the codefendant's Sixth Amendment right of confrontation. (<u>Bruton</u>, supra, at pp. 126, 135-137; <u>Aranda</u>, supra, at pp. 529-530; <u>Fletcher</u>, supra, at p. 455.)

22
23
24
25

<u>Aranda</u>-<u>Bruton</u> error is not reversible per se, but is scrutinized under the harmless error standard of <u>Chapman v. California</u> (1967) 386 U.S. 18. (<u>People v. Burney</u> (2009) 47 Cal.4th 203, 232.) Evidence admitted in violation of <u>Aranda</u>-<u>Bruton</u> will be deemed harmless "'if the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence.'" (<u>People v. Burney</u>, supra, at p. 232.)

26
27
28

Here, we agree with the trial court that the improperly admitted evidence was cumulative of properly admitted evidence. The improper evidence showed that defendant planned to kidnap victim, that Rolando did not want to participate in the actual kidnapping, that defendant was the driver of the car, that the two other men put victim into defendant's car and got in with her, that Rolando got out and followed in the pickup, and that

1
2
3
4
5
6
7
8
9
10
11
12

defendant drove victim to the motel in his car. Defendant himself admitted all of the facts to support the kidnapping in his interview with Detective Waggle, in which he explained that he hired two strangers to help him take victim and put her in his car; victim was afraid and she fought back; she was taken against her will; the two men got in the back seat with victim, and defendant started to drive. And defendant testified at trial that the two men took victim and put her in his car and got in themselves, and that he drove that car to the motel. Furthermore, the evidence against defendant was overwhelming. The case was not a close one, as defendant claims, because his testimony regarding the "surprise" he planned for victim to fulfill her demand to be kidnapped, and his absurd explanations of the meaning of his subsequent repentant, imploring text messages, were simply beyond belief. Defendant argues that the improper evidence revealed his criminal intent and plan to kidnap. This evidence, however, was properly provided by defendant's own statements in both the pretext telephone call and the interview and by Victor's testimony. Defendant told victim he felt bad, ashamed, and guilty for what he had done, and he told Detective Waggle he did not have permission to take victim but he was desperate to see her and talk to her. Victor testified that defendant told Rolando and him to take victim and use force if necessary because she was refusing to see him. We conclude the evidence presented in violation of <u>Aranda</u>-<u>Bruton</u> was harmless beyond a reasonable doubt. (<u>Chapman v. California</u>, supra, 386 U.S. at p. 24.)

13

<u>People v. Zenteno</u>, 2013 Cal. App. Unpub. LEXIS 7286 at 42-48 (Oct. 9, 2013).

14

        2.     Legal Standard

15
16

      The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const.

17

amend. VI. "The 'main and essential purpose of confrontation is to secure for the

18

opponent the opportunity of cross-examination.'" <u>Fenenbock v. Director of Corrections</u>

19

<u>for California</u>, 692 F.3d 910 (9th Cir. 2012) (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S.

20

673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). The Confrontation Clause applies

21

to the states through the Fourteenth Amendment. <u>Pointer v. Texas</u>, 380 U.S. 400, 406,

22

85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

23

      In 2004, the United States Supreme Court held that the Confrontation Clause bars

24

the state from introducing into evidence out-of-court statements which are "testimonial" n

25

nature unless the witness is unavailable and the defendant had a prior opportunity to

26

cross-examine the witness, regardless of whether such statements are deemed reliable.

27

<u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The

28

<u>Crawford</u> rule applies only to hearsay statements that are "testimonial" and does not bar

1  the admission of non-testimonial hearsay statements. Id. at 42, 51, 68. See also

2  Whorton v. Bockting, 549 U.S. 406, 420, 127 S. Ct. 1173, 167 L. Ed. 2d 1 (2007) ("the

3  Confrontation Clause has no application to" an "out-of-court nontestimonial statement.").

4  　　Although the Crawford court declined to provide a comprehensive definition of the

5  term "testimonial," it stated that "[s]tatements taken by police officers in the course of

6  interrogations are .. . testimonial under even a narrow standard." Crawford, 541 U.S. at

7  52. The court also provided the following "formulations" of a "core class" of testimonial

8  statements: (1) "ex parte in-court testimony or its functional equivalent - that is, material

9  such as affidavits, custodial examinations, prior testimony that the defendant was unable

10 to cross-examine, or similar pretrial statements that declarants would reasonably expect

11 to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized

12 testimonial materials, such as affidavits, depositions, prior testimony, or confessions;"

13 and (3) "statements that were made under circumstances which would lead an objective

14 witness reasonably to believe that the statement would be available for use at a later

15 trial." Id. at 51-52. The court in Crawford also pointed out that the Sixth Amendment

16 Confrontation Clause "does not bar the use of testimonial statements for purposes other

17 than establishing the truth of the matter asserted." Id. at 59, n.9. However, "state

18 evidence rules do not trump a defendant's constitutional right to confrontation," and a

19 reviewing court "ensures that an out-of-court statement was introduced for a 'legitimate,

20 nonhearsay purpose' before relying on the not-for-its-truth rationale to dismiss the

21 Confrontation Clause's application." (citation omitted). Williams v. Illinois, U.S. , 132

22 S.Ct. 2221, 2226, 183 L. Ed. 2d 89 (2012).

23 　　In Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968),

24 the case relied on by Petitioner, the Supreme Court held that a defendant is deprived of

25 his Sixth Amendment right of confrontation when a facially incriminating confession of a

26 non-testifying co-defendant is introduced at their joint trial, even if the jury is instructed to

27 consider the confession only against the co-defendant. 391 U.S. at 135. "Under Bruton

28 and its progeny 'the admission of a statement made by a non-testifying codefendant

1    violates the Confrontation Clause when that statement facially, expressly, or powerfully

2    implicates the defendant.'" United States v. Hernandez-Orellana, 539 F.3d 994, 1001

3    (9th Cir. 2008) (quoting United States v. Mitchell, 502 F.3d 931, 965 (9th Cir. 2007)).

4    However, after the issuance of the Crawford decision, "[i]t is . . . necessary to view

5    Bruton through the lens of Crawford," and "the threshold question in every case is

6    whether the challenged statement is testimonial. If it is not, the Confrontation Clause

7    'has no application.'" United States v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir.

8    2010). Accordingly, the rule set forth in Bruton, which is premised on the Confrontation

9    Clause, does not apply to statements which are non-testimonial. United States v.

10   Johnson, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the

11   Confrontation Clause, the Bruton rule, like the Confrontation Clause itself, does not

12   apply to nontestimonial statements."). See also Fernandez v. Adams, No. CV 08-3544

13   PSG (JC), 2011 U.S. Dist. LEXIS 38662, 2011 WL 1344520, *19 n.23 (C.D. Cal. Mar. 1,

14   2011) (petitioner's Confrontation Clause claim "fails to the extent it is intended to be

15   separately predicated upon Bruton.").

16          Further, Confrontation Clause violations are subject to harmless error analysis.

17   Whelchel v. Washington, 232 F.3d 1197, 1205-06 (9th Cir. 2000). "In the context of

18   habeas petitions, the standard of review is whether a given error 'had substantial and

19   injurious effect or influence in determining the jury's verdict.'" Christian v. Rhode, 41 F.3d

20   461, 468 (9th Cir. 1994) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct.

21   1710, 123 L. Ed. 2d 353 (1993)). Factors to be considered when assessing the

22   harmlessness of a Confrontation Clause violation include the importance of the

23   testimony, whether the testimony was cumulative, the presence or absence of evidence

24   corroborating or contradicting the testimony, the extent of cross-examination permitted,

25   and the overall strength of the prosecution's case. Delaware v. Van Arsdall, 475 U.S.

26   673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

27          3.     Analysis

28          With these standards in mind and after a careful review of the record, this Court

1   concludes that Petitioner's Confrontation Clause claim lacks merit and must be denied.

2   The Court presumes for purposes of its analysis that the factual determinations of the

3   California Court of Appeal with regard to Petitioner's Confrontation Clause claims are

4   correct. See 28 U.S.C. § 2254(e)(1). Here, the statements at issue by Petitioner's co-

5   defendants were made during interviews with police. Even under the narrowest

6   interpretation, statements made during police interrogation are testimonial and subject to

7   the Confrontation Clause. See Crawford, 541 U.S. at 52. The state court held that the

8   statements, while in violation of the Aranda/Bruton rule, were harmless based on the

9   cumulative testimony presented by other means.

10      At trial, Deputy Lemus presented testimony from Rolando that he met with Victor

11  and Defendant and they explained that they were going to kidnap Petitioner's girlfriend.

12  He agreed to only be a driver, but ended up helping to kidnap the victim as so they

13  would not get caught, and assisted in driving the victim to the hotel. People v. Zenteno,

14  2013 Cal. App. Unpub. LEXIS 7286 at 42-48.

15      However, in addition to Rolando's testimony regarding the kidnapping, the jury

16  heard both the victim's and Victor's account of the kidnapping. The victim testified that

17  Rolando and Victor forcibly kidnapped her from the front of her house, and along with

18  Petitioner drove her to the motel where she was placed in a room with Petitioner. (Rptr's

19  Tr. at 1561-1601.) Victor testified at trial to a substantially similar accounting of the

20  kidnapping. After assisting Petitioner, he stated that Petitioner paid him a total of $250

21  and gave him a piece of furniture. (Rptr's Tr. at 2489-2518.)

22      Petitioner also confessed to law enforcement regarding most of the elements of

23  the kidnapping described by Rolando. Petitioner's interview tape was played to the jury,

24  and in it he admitted that he hired the two other men to abduct  victim. He admitted that

25  the men waited in his car for the victim, and when she arrived home forced her into his

26  car against her will. He further explained that the men helped drive him and the victim to

27  a motel where they carried her into a room and placed her on the floor. (Clerk's Tr. at

28  325-383.) Petitioner contends that despite the fact that the victim was taken by force,

1   that subsequent sexual encounter was consensual. (Id.)

2       While Petitioner presented a defense at trial that the kidnapping was a cultural

3   practice, and in effect done with the victim's consent, the evidence in question was

4   cumulative of established facts that the victim was kidnapped. The Court finds no reason

5   why the defense regarding cultural practice and consent was impaired by the statements

6   introduced from Rolando.  Petitioner admitted to the facts of the kidnapping.

7       Confrontation Clause claims are subject to harmless error analysis. Ocampo v.

8   Vail, 649 F.3d 1098, 1114 (9th Cir. 2011). On federal habeas review, the Court

9   measures the harmlessness of an error according to the standard established in Brecht,

10  507 U.S. at 637-38. See Fry v. Pliler, 551 U.S. 112, 116, 127 S. Ct. 2321, 168 L. Ed. 2d

11  16 (2007); see also Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010). "Under this

12  standard, habeas petitioners . . . are not entitled to habeas relief based on trial error

13  unless they can establish it resulted in 'actual prejudice.'"

14      In turn, when assessing whether an error had a "substantial and injurious effect,"

15  this Court must consider five factors propagated by the Supreme Court in Van Arsdall:

16  (1) the importance of the witness' testimony in the prosecution's case; (2) whether the

17  testimony was cumulative; (3) the presence or absence of evidence corroborating or

18  contradicting the testimony of the witness on material points; (4) the extent of cross-

19  examination otherwise permitted; and (5) the overall strength of the prosecution's case.

20  Merolillo v. Yates, 663 F.3d 444, 455 (9th Cir. 2011) (citing Van Arsdall, 475 U.S. at

21  684).

22      Even assuming that Rolando's testimony was provided in error, the Court

23  concludes the Van Arsdall factors dictate that the error was not prejudicial under Brecht.

24  The first three factors weigh heavily against Petitioner. Rolando's testimony was not of

25  significant importance to the prosecution's case as it was cumulative and corroborated

26  by both the victim and Petitioner.  Petitioner admitted hiring the two co-defendants to

27  help kidnap the victim. The fact that Petitioner was not able to cross-examination the co-

28  defendant did not affect Petitioner's presentation of his consent defense as he agreed to

the facts of the kidnapping as stated by Rolando. Finally, the case against Petitioner was quite strong. The facts of kidnapping were established by the testimony of Petitioner and the victim, and were further corroborated by the video recordings at the motel. Both Petitioner and the victim testified that she resisted the kidnapping, and as they were the only two present in the motel room for the sexual assault, Petitioner's defense of consent rested on his and the victim's credibility. In addition to the victim's testimony, her actions after the assault also implicated that the incident was a forcible rape rather than a consensual encounter. The victim was injured, and kept her clothing in a bag for law enforcement for testing. Her actions corroborated her account that she was forcibly raped against her will. Upon weighing the Van Arsdall factors, it is unlikely that the admission of Rolando's testimony had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623.

The Court concludes the state court's denial of Petitioner's claim was not an objectively unreasonable application of clearly established federal law. Habeas relief is not warranted as to this claim.

**B.      Claim Two: Denial of Request to Substitute Counsel**

Petitioner, in his second claim for relief, asserts that the trial court violated his right to trial by denying his request to discharge his retained counsel. The state court denied the claim on appeal finding that Petitioner did not make a request to substitute counsel.

### 1.      State Court Decision

The claim was denied in a reasoned decision by the Court of Appeal (Lodged Doc. 40.) and in a subsequent petition for review filed with California Supreme Court (Lodged Doc. 44.) Since the Court of Appeal was the last court to issue a reasoned opinion on this issue, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal. See Ylst v. Nunnemaker, 501 U.S. at 803. In the last reasoned decision denying Petitioner's claim, the appellate court explained:

## II. Motion to Discharge Retained Counsel

Defendant asserts that the trial court erred in denying his "motion to discharge retained counsel." We conclude he made no such motion.

### A. Facts

At the sentencing hearing, following a discussion between the prosecutor and the trial court, defendant's retained counsel told the court: "[Defendant] just indicated that at the conclusion of [the prosecutor's] statement and before the Court issues its ruling, [defendant] would like to address the Court." The court responded: "And he will have that opportunity." The prosecutor and the court resumed their discussion, after which the court asked if either defendant wished to address the court. Defendant made the following statement, the italicized portions of which defendant now claims constituted a motion to discharge retained counsel:

"DEFENDANT ZENTENO: To begin with, I've always said that this was a plan between [victim] and myself. *There were many witnesses of her telling me to steal her away so I could show her how much I loved her and that I could take her to marry her.* She and I talked about that at the hotel. [¶] You know that, [victim].

"THE COURT: [Defendant], you need to speak to me, not to her.

"DEFENDANT ZENTENO: I'm sorry, your Honor. [¶] I also want to say that these two guys are innocent. I said that from the beginning. They had nothing to do with this. They're innocent. [Victim] asked me to get them because of my injury and I think my attorney demonstrated that I was injured, I couldn't do it by myself. I simply wanted to do what she wanted because I loved her, that's all that—those were my intentions.

"*There are several witnesses of what I am saying, I'm not just saying it because I want to say it.*

"Now according to Mr. Ford, who's a corrupt prosecutor, he's saying that I hurt this woman. Where can you say that she was hurt? Her vaginal area, right? Or was it because I beat her? I never hurt her. She says that she defended herself. Why if she was defending herself did she not scratch me or anything? How could that happen? Where she hurt is her inner parts. That part—if at this moment you put us together again she would bleed like that, I'm sure of it.

"THE COURT: Anything further?

"DEFENDANT ZENTENO: *I have a lot to say, I don't know if you'll give me all the time that I need.*

"THE COURT: Well, I'll give you a little time, as long as it's relevant to the sentencing.

"DEFENDANT ZENTENO: If you recall, I sent you a letter asking that you allow me to be face-to-face with [victim] for just a few minutes so that she would remember that she's the one that asked me to do this.

"THE COURT: I recall you sent me a letter asking to be alone with the victim and that's not going to happen. Really that's not beneficial to you to be honest with you, [defendant].

"DEFENDANT ZENTENO: Well, maybe so, but I'm sure of what I'm saying and I'm not lying. You can look in my record, past, present, I've never done anything against anyone. I've never beat anyone. I've never hurt anyone. I don't use drugs, I don't smoke, I don't drink, I don't do any of those things. There's no one accusing me of any of these things. How many times did I hit her or did I harm her?

"THE COURT: Okay, thank you, [defendant]." (Italics added.)

At this point, codefendant Rolando gave his statement, after which the following occurred:

"DEFENDANT ZENTENO: Can I say some more, your Honor? [¶] ... [¶]

"THE COURT: Why don't you talk to your attorney and see if it's relevant to any of the sentencing criteria that the Court has to consider.

"(Discussion between [defense counsel] and defendant Zenteno.)

"[DEFENSE COUNSEL]: He just wanted to make sure that the Court took into consideration the probation report and all the lack of criminal history, and that what he did was motivated not out of hate, vengeance, it was out of love.

"THE COURT: Love?

"[DEFENSE COUNSEL]: We do foolish things sometimes.

"THE COURT: Submit it?

"[DEFENSE COUNSEL]: Submit it, your Honor.

"THE COURT: All right. At this time the Court's going to follow its tentative ruling."

Defendant explains that his "complaints about the many supporting witnesses that retained counsel did not present, although not a model of clarity and specificity, were sufficient to implicate his right to discharge retained counsel and to either hire a new attorney or request counsel's appointment. [Citation.] The trial court made no inquiry regarding timeliness. [Citations.] The denial of defendant's motion to relieve his

retained attorney violated [defendant's] constitutional right to counsel of choice, compels a reversal of the judgment, and requires the resumption of the proceeding with retained or appointed counsel. [Citations.]"

B.   Analysis

A criminal defendant has the right to retain counsel of his choice, which naturally includes the right "to discharge an attorney whom he hired but no longer wishes to retain." (People v. Ortiz (1990) 51 Cal.3d 975, 983 (Ortiz).) A defendant is not required to show cause in order to discharge retained counsel. (People v. Munoz (2006) 138 Cal.App.4th 860, 869.) Nevertheless, a defendant's right to discharge retained counsel is "not absolute" (Ortiz, supra, at p. 983), and the trial court retains "latitude in balancing the right to counsel of choice against the needs of fairness [citation], and against the demands of its calendar" (United States v. Gonzalez-Lopez (2006) 548 U.S. 140, 152). In its discretion, the trial court may deny a motion to discharge retained counsel if the discharge will result in significant prejudice to the defendant or if it is untimely. (Ortiz, supra, at p. 983.)

In this case, the question is whether defendant even invoked his right to discharge his retained counsel. We believe the statements defendant made during the sentencing hearing that there were many witnesses to victim's telling him to steal her away to marry her and show her how much he loved her did not amount to a request or motion to discharge his retained counsel. There must be a much more clear expression of intent to discharge than this. The vague mention of the existence of many unnamed witnesses at the sentencing hearing was not enough. Our conclusion is consistent with what is required in other contexts to invoke counsel-related rights. For example, to invoke a defendant's right under Marsden[fn11] to substitute one appointed counsel for another, "there [must be] 'at least some clear indication by defendant,' ... that [he] 'wants a substitute attorney.' [Citation.]" (People v. Sanchez (2011) 53 Cal.4th 80, 91; see id. at p. 90; People v. Lucky (1988) 45 Cal.3d 259, 281, fn. 8.) Grumblings about counsel's performance is insufficient. (People v. Lee (2002) 95 Cal.App.4th 772, 780.) Similarly, for a criminal defendant to invoke his right to proceed without counsel, there must be an "unequivocal" demand for self-representation. (People v. Valdez (2004) 32 Cal.4th 73, 99.) Finally, for a suspect to invoke his right to counsel after receiving Miranda[fn12] warnings, the "suspect must do so 'unambiguously.'" (Berghuis v. Thompkins (2010) 560 U.S. 370, [130 S.Ct. 2250, 2259].) The underlying principle that a defendant must provide a clear, unequivocal expression applies equally to requests to discharge retained counsel.

**FN11**: People v. Marsden (1970) 2 Cal.3d 118.

**FN12**: Miranda v. Arizona (1966) 384 U.S. 436.

This conclusion also recognizes that it is the defendant's choice whether to discharge his retained counsel. A defendant who is not entirely satisfied with retained counsel has as much right to maintain that counsel as he does to discharge that counsel and seek different representation, and "'[h]is right to decide for himself who best can conduct the case must be respected wherever feasible.'" (People v. Ramirez (2006) 39 Cal.4th 398, 422.) If courts were to loosely interpret ambiguous comments and

1

2

3

criticism of counsel by a defendant as invocations of the right to discharge, they would unduly favor the right to discharge over the right to maintain, while running the risk of unnecessarily interfering with the attorney-client relationship. Requiring a clear expression of intent to discharge, which can be done with simple words, obviates these concerns and helps ensure that a defendant's true wishes are respected.

4

5

We conclude here that defendant failed to clearly express any desire to discharge his retained counsel, and thus we need not consider whether the trial court erred in denying his so-called motion.

6

People v. Zenteno, 2013 Cal. App. Unpub. LEXIS 7286 at 48-55.

7

    2.  Legal Standard

8

  The Sixth Amendment right to counsel encompasses two distinct rights: a right to

9

adequate representation and a right to choose one's own counsel. United States v.

10

Rivera-Corona, 618 F.3d 976, 979 (9th Cir. 2010). The adequate-representation right

11

applies to all defendants and "focuses on the adversarial process, not on the accused's

12

relationship with his lawyer as such." United States v. Cronic, 466 U.S. 648, 657 n. 21,

13

104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). A defendant who can hire his own attorney

14

has a different right, independent and distinct from the right to effective counsel, to be

15

represented by the attorney of his choice. See Rivera-Corona, 618 F.3d at 979 (citing

16

United States v. Gonzalez-Lopez, 548 U.S. 140, 147-48, 126 S. Ct. 2557, 165 L. Ed. 2d

17

409 (2006)) (emphasis omitted). However, the right to retained counsel of one's choice is

18

not absolute. The Supreme Court has "recognized a trial court's wide latitude in

19

balancing the right to counsel of choice against the needs of fairness ... and against the

20

demands of its calendar." Gonzalez-Lopez, 548 U.S. at 152 (citing Wheat v. United

21

States, 486 U.S. 153, 159-60, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988)). As such, trial

22

courts retain the discretion to "make scheduling and other decisions that effectively

23

exclude a defendant's first choice of counsel." Id. In general, a defendant who can afford

24

to hire counsel may have the counsel of his choice unless "the substitution would cause

25

significant delay or inefficiency." Rivera-Corona, 618 F.3d at 979; see also United States

26

v. Ensign, 491 F.3d 1109, 1115 (9th Cir. 2007).

27

  "It is well established and clear that the Sixth Amendment requires on the record

28

an appropriate inquiry into the grounds for such a motion, and that the matter be

1   resolved on the merits before the case goes forward." Schell v. Witek, 218 F.3d 1017,

2   1025 (9th Cir. 2000) (en banc). "[A] state trial court has no discretion to ignore an

3   indigent defendant's timely motion to relieve an appointed attorney." Schell, 218 F.3d at

4   1025, 1026-27  (remanding for evidentiary hearing where state court had failed to make

5   any inquiry into the substance of defendant's claims alleging breakdown of attorney-

6   petitioner relationship, so there was no record of how far that relationship had

7   deteriorated). Even a brief inquiry into the reasons for the defendant's dissatisfaction can

8   be sufficient. See Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982).

9            3.   Analysis

10            The state court denied the claim based on the fact that the statements of

11   Petitioner did not evince the intent to move to discharge counsel. It is without question

12   that Petitioner did not formally move to discharge counsel. At no time during the

13   conversation with the Court did Petitioner state that he was dissatisfied with the

14   performance of counsel. Instead he explained to the Court that he had more to say, and

15   that there were many unnamed witnesses that could testify that the victim told Petitioner

16   to "steal her away" so show her how much he loved her.

17            Petitioner did not accuse counsel of failing to call these witnesses or otherwise

18   express dissatisfaction with counsel's performance. The state court's finding that

19   Petitioner's statements were not a motion to discharge counsel was reasonable. Had

20   Petitioner expressed dissatisfaction with counsel's conduct, however inartfully stated, it

21   would have been proper for the trial court to inquire further, and possibly address

22   whether Petitioner's Sixth Amendment Rights were adequately protected. However, the

23   statements made by Petitioner during sentencing were reasonably construed by the trial

24   court as statements minimizing Petitioner's guilt by inferring that the kidnapping, in

25   addition to the sexual assault, were consensual.

26            The state court, in denying Petitioner's Sixth Amendment claim, reasonably

27   construed Petitioner's statements as claims of innocence rather than an attempt to move

28   to discharge counsel. Petitioner fails to demonstrate that the state court rejection of his

claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Federal habeas relief is not warranted on this claim.

### C.   Claim Three: Ineffective Assistance of Counsel

Petitioner, in his third claim for relief, asserts that counsel was ineffective because of a conflict of interest created by counsel's failure to present witnesses favorable to Petitioner.

#### 1.   State Court Decision

The claim was denied in a reasoned decision by the Court of Appeal (Lodged Doc. 40.) and in a subsequent petition for review filed with California Supreme Court (Lodged Doc. 44.) Since the Court of Appeal was the last court to issue a reasoned opinion on this issue, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal. See Ylst v. Nunnemaker, 501 U.S. at 803. In the last reasoned decision denying Petitioner's claim, the appellate court explained:

C.   Conflict of Interest

In the alternative, defendant contends the matter should be remanded for a conflict of interest hearing because the trial court was obligated to conduct an inquiry after defendant stated that supporting witnesses had not been presented. This assertion, he argues, created a conflict of interest for defense counsel because it prevented him from moving for a new trial on the ground of his own ineffective assistance. We conclude defendant suffered no prejudice.

"The federal and state constitutional right to counsel in a criminal case also includes the right to representation free of conflicts of interest that may compromise the attorney's loyalty to the client and impair counsel's efforts on the client's behalf. (E.g., Glasser v. United States (1942) 315 U.S. 60, 69-70; People v. Doolin (2009) 45 Cal.4th 390, 417 (Doolin).)" (People v. Mai (2013) 57 Cal.4th 986, 1009.) In Wood v. Georgia (1981) 450 U.S. 261, the court held that when the trial court knows or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, the court is required to make inquiry into the matter. (Id. at p. 272 & fn. 18.) To obtain reversal, however, the defendant "must show that an actual conflict of interest existed and that that conflict adversely affected counsel's performance." (People v. Bonin (1989) 47 Cal.3d 808, 837-838.) The courts have more recently clarified that, "[f]or both state and federal purposes, a claim of conflicted representation is one variety of claim that counsel provided ineffective

assistance. Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different. (Mickens v. Taylor (2002) 535 U.S. 162, 166 (Mickens); Doolin, supra, at pp. 417-418, 421; see Strickland v. Washington (1984) 466 U.S. 668, 687, 694.)" (People v. Mai, supra, at p. 1110.)

If we assume defense counsel labored under an actual conflict of interest because he failed to present other witnesses to testify that victim told defendant he should steal her to show how much he loved her and to marry her, and that this conflict prevented counsel from moving for a new trial on the ground of his own ineffectiveness for failing to present those witnesses, we would still not find a reasonable probability that the outcome would have been different. The testimony of any such witnesses would have been cumulative to defendant's testimony, and there would have remained extensive evidence that defendant took victim against her will, that she screamed and struggled to defend and free herself, that she had to be tied up and subdued, and that defendant forced himself on her sexually. Defendant himself admitted that he took victim against her will, that he tied her hands and feet so she would not escape, that he told her he expected her to be upset but he was desperate, and that she screamed at him that he was not a man (until he put tape over her mouth). Only later did he produce the story that by kidnapping victim, he was simply honoring her romantic request to be taken by him. Under these circumstances, defendant would not have been prejudiced by counsel's failure to call the witnesses, and the trial court would not have granted a motion for new trial based on counsel's failure to do so. This claim therefore fails.

People v. Zenteno, 2013 Cal. App. Unpub. LEXIS 7286 at 55-58.

### 2.   Legal Standard

The Sixth Amendment right to the effective assistance of counsel includes a correlative right to representation free of conflicts of interest. See Wood v. Georgia, 450 U.S. 261, 271, 101 S. Ct. 1097, 1103, 67 L. Ed. 2d 220 (1981). To establish a violation of the Sixth Amendment right to conflict-free counsel, a defendant must show that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S. Ct. 1708, 1719, 64 L. Ed. 2d 333 (1980). For Sixth Amendment purposes, an "actual conflict" is a conflict of interest that "adversely affects counsel's performance." Mickens v. Taylor, 535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 1244 n.5, 152 L. Ed. 2d 291 (2002). "[A] mere theoretical division of loyalties" is not enough. Id. at 171, 122 S. Ct. at 1244. The Ninth Circuit has stated that, to demonstrate an actual conflict resulting in an adverse effect, the defendant must demonstrate "that some

1    plausible alternative defense strategy or tactic might have been pursued but was not and

2    that the alternative defense was inherently in conflict with or not undertaken due to the

3    attorney's other loyalties or interests." Hovey v. Ayers, 458 F.3d 892, 908 (9th Cir. 2006)

4    (quoting United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005)). If a defendant shows

5    an actual conflict of interest under these standards, prejudice is presumed. Cuyler, 446

6    U.S. at 349-50, 100 S. Ct. at 1719.

7         To show an adverse effect, a petitioner must show "that some plausible

8    alternative defense strategy or tactic might have been pursued but was not and that the

9    alternative defense was . . . not undertaken due to the attorney's other loyalties." United

10   States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005) (internal quotation omitted); see also

11   United States v. Shwayder, 312 F.3d 1109, 1118 (9th Cir. 2002) ("To show that an actual

12   conflict had an adverse effect, . . . the defendant must establish that counsel was

13   influenced in his basic strategic decisions by the [conflicting] interests.") (internal

14   quotation marks and citation omitted).

15        3.    Analysis

16        In this case, Petitioner does not argue that the conflict was created due to

17   defense counsel's representation or relationship with another party (i.e., a co-defendant),

18   but is instead based on the fact that counsel has a conflict based on counsel's alleged

19   ineffectiveness in failing to call material witnesses beneficial to Petitioner's case.

20        Petitioner claims that counsel failed to call several witnesses that could

21   corroborate Petitioner's narrative that the victim had requested the abduction and

22   resulting sexual encounter. The California court assumed that even if a conflict existed

23   and prevented counsel from moving for a new trial as it would reveal his ineffectiveness

24   in failing to call the witness, Petitioner has not shown that he was prejudiced by

25   counsel's conduct.

26        As the state court reasoned, any testimony of the alleged witnesses would not

27   change the result of trial. Even had the witnesses corroborated Petitioner's version, the

28   juror would have heard the victims testimony that the she was abducted against her will,

1  that she screamed and struggled to free herself, that she was physically tied up, and that

2  Petitioner forced himself on her sexually. Defendant provided testimony consistent to the

3  victim's that she was taken against her will, resisted, and was upset and screaming at

4  Petitioner. Even had such other witnesses existed, the state court was reasonable in

5  determining that there was little probability that the testimony would have affected the

6  jury's verdict, or been the basis for a new trial.

7      The state court decision was neither contrary to, nor an unreasonable application

8  of, clearly established Supreme Court law, nor was its decision based on an

9  unreasonable determination of the facts. Accordingly, Petitioner is not entitled to relief

10  with regard to his third claim.

11      **D.   Claim Four: Failure to Submit Claims to a Jury**

12      Petitioner, in his last claim for relief, asserts that the jury, rather than the trial

13  court, should have determined whether there were one or two sexual assaults as to

14  determine whether his claims should run consecutively.

15      1.   State Court Decision

16      The claim was denied in a reasoned decision by the Court of Appeal (Lodged

17  Doc. 40.) and in a subsequent petition for review filed with California Supreme Court

18  (Lodged Doc. 44.) Since the Court of Appeal was the last court to issue a reasoned

19  opinion on this issue, this Court "looks through" the California Supreme Court decision to

20  the reasoned analysis of the Court of Appeal. See Ylst v. Nunnemaker, 501 U.S. at 803.

21  In the last reasoned decision denying Petitioner's claim, the appellate court explained:

22      IV.   Fact Finding Required for Consecutive Sentences

23          In a related argument, which defendant raises on rehearing, he
24      contends the jury, not the trial court, should have made the factual finding
        that the two offenses occurred on separate occasions, a finding that
25      mandated consecutive sentences under section 667.61. He asserts that
        the recent case of Alleyne, supra, U.S. [133 S.Ct. 2151], an extension of
26      Apprendi v. New Jersey (2000) 530 U.S. 466 (Apprendi), supports his
        position.

27          In Apprendi, supra, 530 U.S. 466, the United States Supreme Court
28      held that under the Sixth Amendment, "any fact that increases the penalty
        for a crime beyond the prescribed statutory maximum must be submitted

1    to a jury, and proved beyond a reasonable doubt." (Apprendi, supra, at p.
2    490.) In Alleyne, supra, U.S. [133 S.Ct. 2151], the court held that the same
     requirement applies to "any fact that increases the mandatory minimum"
     sentence for a crime. (Id. at p. [2155].)

3        Defendant's argument relies on the premise that imposing
4    consecutive sentences is the equivalent of increasing the mandatory
     minimum sentence for a crime. But the argument that the Apprendi rule
5    applies to fact finding engaged in by the trial court to justify consecutive
     sentences has been rejected by both the California Supreme Court and
6    the United States Supreme Court: "'The decision to impose sentences
     consecutively is not within the jury function that "extends down centuries
7    into the common law." [Citation to Apprendi.] Instead, specification of the
     regime for administering multiple sentences has long been considered the
8    prerogative of state legislatures.' (Oregon v. Ice (2009) 555 U.S. 160, 168
     [(Ice)].) Similarly, '[t]he determination whether two or more sentences
9    should be served [consecutively] is a "sentencing decision[ ] made by the
     judge after the jury has made the factual findings necessary to subject the
10   defendant to the statutory maximum sentence on each offense" and does
     not "implicate[ ] the defendant's right to a jury trial on facts that are the
11   functional equivalent of elements of an offense." [Citation.]' (People v.
     Black [(2007)] 41 Cal.4th [799,] 823.)" (People v. McKinzie (2012) 54
12   Cal.4th 1302, 1369-1370.) Ice concluded that the Apprendi rule, which is
     designed to prevent legislative encroachment on the jury's traditional
13   domain, extended only to decisions concerning the "discrete sentencing
     prescriptions" applicable to each specific offense, not to sentencing
14   decisions concerning multiple offenses. (Ice, supra, at pp. 163, 167-168.)
     We do not believe Alleyne changes this conclusion.

15   People v. Zenteno, 2013 Cal. App. Unpub. LEXIS 7286 at 64-66.

16       2.      Legal Standard

17       "The decision whether to impose sentences concurrently or consecutively is a

18   matter of state criminal procedure and is not within the purview of federal habeas

19   corpus." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994); accord. South v.

20   Schaivo, 289 F.3d 616, 623 (9th Cir. 2002) ("because the trial court actually had

21   absolute discretion to impose either consecutive or concurrent sentences[,] ... neither an

22   alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the

23   trial court's alleged failure to list reasons for imposing consecutive sentences, can form

24   the basis for federal habeas relief." (emphasis omitted)); see also Oregon v. Ice, 555

25   U.S. 160, 129 S. Ct. 711, 172 L. Ed. 2d 517 (2009) (no Apprendi error if a judge

26   determines to impose consecutive sentences in lieu of the jury).

27       3.      Analysis

28       Petitioner contends that he was improperly sentenced, and that the sentences for

1   kidnapping and rape should have been imposed concurrently, rather than made to run
2   consecutively.

3         Petitioner argues that the evidence in the case supports a finding that the crimes
4   were conducted during a single course of conduct, and the resulting sentences should
5   be served concurrently. Petitioner's argument that it was one continuous episode is
6   solely based on an interpretation of California's sentencing law, and, therefore, his claim
7   cannot be reviewed by a federal court on a petition for habeas corpus. See Estelle v.
8   McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("it is not the
9   province of a federal habeas court to reexamine state-court determinations on state-law
10  questions."). Even if this Court could review this claim, there was no error by the
11  California court as there was sufficient evidence to support the consecutive sentences
12  based on Petitioner's actions against the victim. The court relied on findings of the jury to
13  base the consecutive sentences. The jury specifically found true the allegation that with
14  respect to the kidnapping, "the movement of the victim substantially increased the risk of
15  harm to the victim over and above the level of risk necessary inherent in the crime of
16  rape in concert." (Clerk's Tr. at 187.) Accordingly, there was sufficient evidence that the
17  kidnapping and rape was not part of a single course of conduct.

18        Petitioner fails to demonstrate that the state court rejection of his claim "resulted
19  in a decision that was contrary to, or involved an unreasonable application of, clearly
20  established Federal law, as determined by the Supreme Court of the United States." 28
21  U.S.C. § 2254(d). Accordingly, the claim should be denied.

22  **IV.    RECOMMENDATION**

23        Accordingly, it is hereby recommended that the petition for a writ of habeas
24  corpus be DENIED with prejudice.

25        This Findings and Recommendation is submitted to the assigned District Judge,
26  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after
27  being served with the Findings and Recommendation, any party may file written
28  objections with the Court and serve a copy on all parties.  Such a document should be

captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   June 29, 2016            /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE